UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

In re

ISLAND GASTROENTEROLOGY
CONSULTANTS, P.C.,

                    Debtor.

--------------------------------------------------------------X

**NOT FOR PUBLICATION**

Chapter 11

Case No. 26-70198-spg

## <u>**MEMORANDUM DECISION**</u>

**Appearances:**

KLESTADT, WINTERS, JURELLER,
SOUTHARD & STEVENS, LLP
*Counsel to Island Gastroenterology Consultants, P.C.*
200 West 41st Street, 17th Floor
New York, New York 10036
By: Sean Southard, Esq.
    Andrew Brown, Esq.

BARCLAY DAMON, LLP
*Counsel to Dr. Rajiv Saxena*
1270 Avenue of the Americas, Suite 2310
New York, New York 10020
By: Allen Underwood, Esq.
    Benjamin Zakarin, Esq.

STEVENS & LEE, P.C.
*Counsel to Link Medical Services, PLLC*
485 Madison Avenue
New York, New York 10022
By: Constantine D. Pourakis, Esq.
    Edward Whipper, Esq.
    Robert Lapowsky, Esq.

WILLIAM K. HARRINGTON,
UNITED STATES TRUSTEE FOR REGION 2
*Office of the United States Trustee*
Alfonse M. D'Amato Federal Courthouse
560 Federal Plaza, Room 560
Central Islip, New York 11722
By: William Birmingham, Esq.

## TABLE OF CONTENTS

**I.**      **INTRODUCTION**.................................................................................................... **1**

**II.**     **BACKGROUND AND FACTS** ............................................................................. **2**

    A.    The Debtor's Practice ...................................................................................... 2

    B.    The Debtor's Chapter 11 Case and Secured Debt............................................ 2

    C.    Dr. Saxena and State Court Litigation ............................................................ 3

    D.    The Sale Motion, Bid Procedures, and Sale Hearing....................................... 4

    E.    The Purchase Price.......................................................................................... 6

    F.    The Debtor's Accounts Receivable.................................................................. 7

    G.    Marketing Efforts............................................................................................ 8

**III.**    **DISCUSSION** ..................................................................................................... **10**

    A.    Standard for Approving Sale of Assets .......................................................... 10

        1.    *Bankruptcy Code § 363(b)* ..................................................................... *11*

        2.    *The Lionel  Factors* ............................................................................... *14*

        3.    *Sale Guidelines* ..................................................................................... *16*

        4.    *Objections to the Sale* ........................................................................... *16*

**IV.**     **CONCLUSION** .................................................................................................. **25**

## I.    INTRODUCTION

Before the Court is the motion, filed April 14, 2026 [ECF No. 93] (the "Motion"), by Island Gastroenterology Consultants, P.C. (the "Debtor"), the above-captioned debtor and debtor-in-possession, seeking entry of an order authorizing the Debtor to sell substantially all of its assets (the "Assets") free and clear of liens, claims and encumbrances to Link Medical Services PLLC or its assignee ("Link"), pursuant to section 363 of title 11, United States Code (the "Bankruptcy Code"). After a previous hearing, the Court approved the bidding procedures set forth in the Motion and the form of Asset Purchase Agreement by and between the Debtor and Link (the "Stalking Horse APA").  An order was entered May 4, 2026 [ECF No. 106] (the "Bid Procedures Order"), setting a hearing to approve the sale of the Assets to the successful bidder.[1]  Pursuant to the Bid Procedures Order, an auction was to take place if qualified bids were received.

On June 30, 2026, the Debtor filed a letter [ECF No. 135] advising that no qualified bids were received by the bid deadline and, therefore, pursuant to the Bid Procedures Order, no auction would take place.  The Debtor submits it has good business reasons for selling the Assets prior to confirmation of a plan under the legal standard articulated in *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.*), 722 F.2d 1063 (2d Cir. 1983).  In support of request for entry of an order approving the sale of the Assets to Link, certain declarations were filed (collectively, the "Supporting Declarations"): (i) a declaration dated June 30, 2026 by Brian Ryniker, Chief Restructuring Officer ("CRO") of the Debtor and a member of RKC, LLC *d/b/a* RK Consultants LLC ("RKC") [ECF No. 133] (the "Ryniker Declaration"); (ii) a declaration dated June 30, 2026 by Dr. Nitin Mariwalla, Link's principal and the son of the Debtor's principal [ECF No. 134] (the

---

[1] On April 24, 2026, Dr. Rajiv Saxena filed an objection [ECF No. 102] to the proposed bidding procedures.

"Link Declaration"); and (iii) a supplemental declaration dated July 8, 2026 by Mr. Ryniker as CRO [ECF No. 141] (the "Ryniker Supplemental Declaration").

On July 6, 2026, Dr. Rajiv Saxena filed an objection to the Motion [ECF No. 138] (the "Saxena Objection"), and on July 8, 2026, the Debtor filed a reply [ECF No. 140] (the "Reply").

On July 14, July 16 and July 17, 2026, the Supporting Declarations were admitted into evidence and accepted as the declarants' direct testimony, counsel to Dr. Saxena cross-examined the CRO and Dr. Nitin Mariwalla, and re-direct testimony was taken from both.

After due deliberation and for the reasons set forth below, the Court finds that (i) the Debtor has established cause to grant the relief requested in the Motion with respect to approving the sale of the Assets to Link and waiving the fourteen (14) day stay under rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and (ii) the Saxena Objection is overruled.

## II.    BACKGROUND AND FACTS

### A. The Debtor's Practice

The Debtor is a medical practice specializing in gastroenterology in Long Island, treating a range of gastrointestinal diseases and offering medical procedures such as colonoscopies, endoscopic ultrasounds and endoscopies. [ECF No. 5]. The Debtor is owned fifty percent (50%) by Dr. Rajkumar Mariwalla and fifty percent (50%) by his daughter, Dr. Kavita Mariwalla.

### B. The Debtor's Chapter 11 Case and Secured Debt

On January 14, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. [ECF No. 1]. According to the Debtor's schedules (the "Schedules"), as of the Petition Date, the Debtor had $1,614,190.19 in assets and $2,581,437.76 in secured and unsecured debt. [ECF No. 47].

Link is allegedly a secured creditor of the Debtor pursuant to a promissory note in the principal sum of $140,000.00 (the "Link Note") and security agreement (the "Link Security Agreement"), both dated just before the Petition Date. Link is one hundred percent (100%) owned by Nitin Mariwalla P.C., which is wholly owned by Dr. Nitin Mariwalla. [07/14/2026 Hearing Tr., p. 57]. Dr. Rajkumar Mariwalla is also allegedly a secured creditor of the Debtor, though subordinate to Link, and is owed $516,944.44 with a lien against the Debtor's personal property. [Schedule D, ECF No. 47].

### C. Dr. Saxena and State Court Litigation

Dr. Saxena is a physician and a former owner of the Debtor. Dr. Saxena filed a proof of claim in this case asserting an unsecured claim in the amount of $17,800,000.00 [P.O.C. No. 11-1] (the "Saxena Claim"). The Saxena Claim arises from an action commenced by Dr. Saxena in 2015 in New York State Supreme Court, Suffolk County, Index. No. 604522/2015 (the "Saxena Action") against the Debtor and Dr. Rajkumar Mariwalla personally, alleging, *inter alia*, breach of contract, fraud and breach of fiduciary duty. [ECF Nos. 7, 18]. In July 2025, the Saxena Action was tried before a jury, and on July 28, 2025, the jury returned verdicts in the approximate amount of $4.3 million against the Debtor and in the amount of $13.5 million against Dr. Rajkumar Mariwalla personally. [ECF No. 7]. Following the verdict, Dr. Saxena filed a motion to add the Debtor as a defendant to the verdicts against Dr. Rajkumar Mariwalla. That motion in the Saxena Action is presently stayed as a result of the Debtor's bankruptcy filing.

On February 12, 2026, this Court entered an Order [ECF No. 50] denying Dr. Saxena's motion for relief from the automatic stay to proceed with the Saxena Action as against the Debtor and stating that the automatic stay does not extend to Dr. Rajkumar Mariwalla. The Debtor lists

Dr. Saxena's claim in its Schedules in an unknown amount and describes it as contingent, unliquidated and disputed. [ECF No. 47].

### D.  The Sale Motion, Bid Procedures, and Sale Hearing

On April 14, 2026, the Debtor filed the Motion, and on April 29, 2026, a hearing was held to consider: (i) approving the bid procedures; (ii) approving the form and manner of notice for the bid procedures; (iii) establishing Link as the stalking horse bidder for the Assets; (iv) approving the form of Asset Purchase Agreement; and (v) setting a hearing to approve the proposed sale (collectively, the "Bid Procedures").

On April 24, 2026, Dr. Saxena filed an objection to the bid procedures [ECF No. 102], and appeared at the hearing asserting, among other things, that the proposed timeline was too short to adequately market the assets (which Dr. Saxena asserted were also unclear) for sale.  Dr. Saxena also objected to whether Link was an eligible purchaser under state and federal healthcare laws and regulations. The Court reminded the parties that any order approving a sale would confirm that the Court is not opining on or approving the eligibility of Link as a purchaser under those applicable laws. The Debtor agreed to extend the proposed marketing period by approximately an additional three (3) weeks, and the Court overruled Dr. Saxena's objection and approved the bid procedures with the modifications agreed to by and among the Debtor, Link and Dr. Saxena.

On May 4, 2026, the Bid Procedures Order was entered, fixing July 10, 2026 as the hearing date to approve the sale of the Assets to the successful bidder (the "Sale Hearing"). [ECF No. 106]. On May 7, 2026, the Debtor filed a notice [ECF No. 108] of unexpired leases and executory contracts identified for possible assumption and assignment with the proposed cure costs, and establishing procedures with respect to possible objections.  On May 12, 2026, the Court approved a stipulation and order [ECF No. 113] between the Debtor and a landlord, Maya Realty LLC,

extending the Debtor's time to assume, assume and assign, or reject the relevant unexpired lease through August 12, 2026. The Sale Hearing was then adjourned to July 14, 2026.  [ECF No. 139].

On June 30, 2026, the Debtor filed a letter advising that no qualified bids were received from any third parties to purchase the Assets and, therefore, the auction would be cancelled in accordance with the Bid Procedures Order. [ECF No. 135].  In anticipation of the Sale Hearing, on June 30, 2026, the Debtor filed the Ryniker Declaration in support of approving the sale of the Assets to Link.  Also on June 30, 2026, Link filed the Link Declaration in support of a finding that Link is a good faith purchase pursuant to Bankruptcy Code § 363(m) and (n).

On July 6, 2026, in anticipation of the Sale Hearing at which the Debtor would be seeking approval of the Asset Purchase Agreement with Link, Dr. Saxena filed the Saxena Objection.

On July 8, 2026, the Debtor filed the Reply to the Saxena Objection and in further support of the Motion, and the Ryniker Supplemental Declaration addressing some of the objections raised on the Saxena Objection.

On July 14, 16, and 17, 2026, the Sale Hearing was held. Towards the conclusion of the Sale Hearing, the Court advised that it would notify the parties in the event additional briefing would be necessary to assist the Court in ruling on the Sale Motion. [07/17/2026 Hearing Tr., pp. 17−19].  On July 17, 2026, after the conclusion of the Sale Hearing, the Debtor filed a letter advising that one of the Debtor's doctors, Dr. Darius Sorbi, resigned from the Debtor's practice effective July 31, 2026, and that Link is still willing to purchase the Assets pursuant to the Stalking Horse APA, notwithstanding the closing condition that all remaining doctors employed by the Debtor transition to Link. [ECF No. 143]. On August 4, 2026, Dr. Saxena filed an objection to the Debtor's continued use of cash collateral, in which Dr. Saxena does not have an interest, to claim that the Court requested an additional declaration by the CRO as to the bona-fides as to the bid

submitted by Link. [ECF No. 151]. On August 7, 2026, the Debtor responded that the Court would contact the parties if additional submissions would be required, and the Court did not seek additional submissions to date. [ECF No. 152]. On August 7, 2026, Dr. Saxena filed a letter correcting this statement and clarifying that the Debtor's recollection was correct. [ECF No. 153]. No further submissions were required by the Court, and the Motion was marked submitted.

### E.  The Purchase Price

To ensure that the Assets would be sold for the maximum price, the Debtor and Link entered into the Stalking Horse APA. With Link in place as the stalking horse bidder, the hope was that interested bidders would use the purchase price as a floor and bidding would ensue at an auction. Because Link is an "insider" under Bankruptcy Code § 101(31), negotiations took place between Link's counsel and the CRO, rather than between Dr. Nitin Mariwalla on behalf of Link, and his father, Dr. Rajkumar Mariwalla, on behalf of the Debtor.  Dr. Rajkumar Mariwalla and Dr. Nitin Mariwalla did not negotiate with one another directly. [07/14/2026 Hearing Tr., pp. 66−67].

Under the terms of the Stalking Horse APA, the consideration for the Assets is as follows (collectively, the "Purchase Price"): (i) $250,000.00; (ii) minus the sum of all of the Debtor's liabilities for accrued vacation time, sick pay time and other unpaid wages, salaries and other compensation owed to Hired Employees (as defined in the Stalking Horse APA) as of the Closing Date (as defined in the Stalking Horse APA); plus (iii) a sum equal to ninety-five percent (95%) of Debtor's accounts receivable outstanding as of the Closing Date that are (a) dated less than ninety (90) days from the Closing Date, and (b) bona fide, properly billed and, to the Debtor's knowledge, is collectable; plus (iv) Link's assumption of the assumed liabilities, which would include one lease for premises located in Long Island. The total value of the Purchase Price is approximately $860,000.00.

At the Sale Hearing, and in response to cross-examination testimony regarding the Purchase Price, in particular the value allocated to the Debtor's accounts receivable — both under and over ninety (90) days — the CRO and Debtor's counsel indicated that the Stalking Horse APA will be amended so that actual accounts receivable paid within the ninety (90) day period would be reconciled, resulting in a "true up" or modification of the Purchase Price. [07/16/2026 Hearing Tr., pp. 5−6].

## F.  The Debtor's Accounts Receivable

Under the structure of the Stalking Horse APA, the Debtor's entire accounts receivable will be sold to Link, but the value of the accounts receivable component will be calculated only based on ninety-five percent (95%) of the accounts receivable outstanding as of the Closing Date that are dated within ninety (90) days of the Closing Date. As explained in the Ryniker Supplemental Declaration, as early as May 20, 2026, Mr. Ryniker reported at a status conference before the Court that from the Petition Date through early May 2026, RKC relied on the reporting of receivables received from Commit Services Inc. ("Commit") and Modernizing Medical Billing Services LLC ("ModMed"). [Ryniker Supplemental Declaration at p. 3]. Commit and ModMed are the third-party revenue cycle management ("RCM") service providers which, among other things, process medical claims and bill and collect receivables from third-party payors. [*Id.*]. As reported in the Schedules, the Debtor estimated the *net* value of receivables (under ninety (90) days) as of January 29, 2026, at $1,193,770.13 as compared to *gross* invoiced receivables (under ninety (90) days) at that time of $2,658,094.57. [ECF No. 47]. This collection rate suggested that approximately forty-five percent (45%) of the invoiced receivables were collectible based upon the reporting of Commit and ModMed. However, while the total gross receivables under ninety (90) days as of April 30, 2026 amounted to $2.8 million as invoiced, the actual net recoverable receivable value that the

7

Debtor would expect to be paid from third-party payors on account of the gross invoiced amounts was approximately $534,000.00. Therefore, the Debtor's actual collections during the post-petition period were averaging about 19.1%. [Ryniker Supplemental Declaration at p. 4]. This is substantially less than what the RCM service providers had been reporting. In the Ryniker Supplemental Declaration, Mr. Ryniker concluded that based on his investigation, the third-party RCM service providers were not only overstating their potential recovery percentages compared to actual collections, but they were in some instances reporting on the same receivables batches, resulting in duplicative values. [*Id.*].

To date, the Debtor has not corrected the value of its receivables as reported in the Schedules. Although there were errors in the calculation of the estimated collectible accounts receivable at the onset of the case, the cash collected each month for the post-petition period remained consistent with cash flow projections included within the budget provided by the Debtor in connection with the Debtor's use of cash collateral. [*Id*. at p. 5]. The Debtor recorded $9.7 million in gross revenue for 2025 and the prior two years reflected similar annual revenue numbers. [07/16/2026 Hearing Tr., pp. 95, 98−107; Dr. Saxena Ex. 8].

### G.  Marketing Efforts

As the CRO set forth in his testimony, he understood that the Debtor was pursuing a sale of the Assets because, among other reasons, after forty (40) years of practice, Dr. Rajkumar Mariwalla was interested in retaining the doctors and other employees of the Debtor and maintaining continuity of care for the Debtor's patients. [07/16/2026 Hearing Tr., p. 32].  After entry of the Bid Procedures Order, RKC re-engaged with each of the parties previously contacted prior to filing the Motion, as well as an additional eighteen (18) parties that either operate as gastroenterology practices located in New York City and Long Island or as regional management

8

service organizations known to support gastroenterology practices. [Ryniker Supplemental Declaration, p. 6]. Mr. Ryniker testified that his firm contacted Northwell, Good Samaritan, Catholic Hospital, Winthrop Hospital and Stonybrook Hospital. [07/14/2026 Hearing Tr., p. 158]. A New York City based gastroenterology group was also approached. [Ryniker Supplemental Declaration, p. 5]. Liquidating companies also expressed an interest in purchasing the accounts receivable, but only one entity signed a non-disclosure agreement. [*Id*.]. No party other than Link was interested in becoming a stalking horse bidder and no party submitted a bid for all or part of the Assets. [*Id*.]. Any interested parties could access the Debtor's sale information and data room which contained accurate information regarding the receivables and the cash collections at all relevant times. [Ryniker Supplemental Declaration, p. 5].

According to the CRO, the Debtor's most valuable assets are the doctors who see patients and the staff who assist those doctors and handle the administration of the office. [*Id.* at p. 6]. Those assets leave the office each night and go home as is the case with any professional service business, such as a law firm or accounting firm. Interested party diligence appeared to be focused on the doctors' agreements, whether they could be forced to transition absent their consent to a new purchaser, and what such terms might be. Overall, target potential purchasers, particularly larger hospitals, preferred to simply offer the Debtor's physician employees jobs at their facilities rather than entering into a transaction with the Debtor to purchase its assets as a turnkey operation, let alone for a price that was higher and better or even comparable to Link's present offer.  [*Id.*; 07/16/2026 Hearing Tr., p. 140, pp. 48−49].

9

## III.    DISCUSSION

### A.  Standard for Approving Sale of Assets

Bankruptcy Code § 363(b) provides, in relevant part, that, after notice and a hearing, a debtor-in-possession "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). The Debtor has the burden of establishing a sound business reason to go forward with the sale process now instead of proceeding with a plan. *In re GSC, Inc.*, 453 B.R. 132, 155 (Bankr. S.D.NY. 2011) (citing *In re Boston Generating, LLC*, 440 B.R. 302, 329 (Bankr. S.D.N.Y. 2010)). Once a good business justification is articulated by the sale proponent, "there 'is a presumption that in making a business decision the [decision maker] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Giftcraft Ltd.*, 672 B.R. 173, 181 (Bankr. S.D.N.Y. 2025) (citing *Official Comm. of Subordinated Bondholders v. Integrated Res, Inc.*, 47 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)).

In determining whether a sufficient business reason to authorize a sale has been articulated, courts consider the following non-exclusive factors: "(1) the proportionate value of the asset to the estate as a whole; (2) the amount of time elapsed since the filing; (3) the likelihood of proposing and confirming a plan in the near future; (4) the effect of the proposed sale on any reorganization; (5) the sale price to be obtained with reference to any appraisals of the property; (6) alternative uses of the property; and (7) whether the asset is increasing or decreasing in value." *In re Giftcraft Ltd.*, 672 B.R. at 181 (citing *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)). In addition to the requirements imposed by the Bankruptcy Code, the U.S. Bankruptcy Court for the Eastern District of New York has sale guidelines adopted and set forth in Administrative Order No. 557 (the "Guidelines").

10

In addition to satisfying the business judgment rule, the following requirements applicable to section 363 sales must also be met: (i) proper notice has been given to all creditors and interested parties; (ii) the proposed sale price is fair and reasonable; and (iii) the purchaser is proceeding in good faith. *In re Bos. Generating, LLC*, 440 B.R. 302, 330 (Bankr. S.D.N.Y. 2010) (citing *In re General Motors Corp.*, 407 B.R. 463, 493−94 (Bankr. S.D.N.Y. 2009)).

After careful review and thoughtful consideration of the record, including the pleadings, testimony and exhibits, the Court is satisfied that the Debtor has established a sound business justification for the sale of the Assets, and the Bankruptcy Code requirements are satisfied.

### 1. Bankruptcy Code § 363(b)

The Court next examines the requirements under Bankruptcy Code § 363. First, the Debtor provided appropriate notice of the sale to all interested parties, including the terms of the sale, the effect on the Debtor's business, and why it is in the best interests of the Debtor's estate. The Debtor did so through, among other things, filing and serving the Motion, the Bid Procedures Order, the Ryniker Declaration, the Ryniker Supplemental Declaration, the Reply, and through the data room. Second, consistent with the evidence provided by the Debtor through its CRO, the proposed purchase price is fair and reasonable. The Debtor conducted a robust marketing process, and despite legal arguments as to the potential value of the Debtor's assets, the Debtor received no other offers. It is not uncommon in the healthcare industry for smaller practices to be absorbed into hospital organizations without asset purchase agreements.  Instead, hospitals offer employment contracts to the physicians, equipment is returned to lessors or sold at a significant discount, and locations are closed or consolidated.  Accordingly, the CRO's testimony only confirms what the Court already understood in these circumstances.

11

With respect to the value of the equipment being sold, the CRO testified that while the equipment included in the Purchase Price was unencumbered, most was fully depreciated and rather old. Therefore, he did not obtain an appraisal. [07/16/2026 Hearing Tr., pp. 126, 127].

With respect to the Debtor's accounts receivable and collectability questions raised by Dr. Saxena's counsel, Dr. Nitin Mariwalla, an experienced and sophisticated doctor and businessperson, testified that he was not terribly surprised by the significant decrease in collectability with respect to the Debtor's receivables and noted that medical practices go through these cycles. It is relevant to the Court that Dr. Nitin Mariwalla understands the nature of a medical practice, medical billing procedures and collectability issues. In fact, Link is the only interested party offering to serve as a stalking horse bidder, and to quickly close a transaction with the Debtor for its assets. Absent Link's willingness to do so, the practice would likely be forced to close on a very short timeline. The budget annexed to the Debtor's motion filed on the Petition Date seeking authorization for use of cash collateral [ECF No. 5, Ex. C] reflects, and Debtor's counsel has stated on the record at more than one hearing, that the Debtor's cash position is quickly eroding and an imminent sale is necessary for the practice's survival. Furthermore, it is a mistake to equate the Debtor's gross annual revenue with positive net cash flow. The Debtor's annual revenue, which evidence shows has remained consistent from 2023 through 2025, was included in the teaser presented to prospective purchasers. [Dr. Saxena Ex. 8]. These prospective purchasers were provided with the Debtor's annual revenue numbers and could have determined to make a bid based on these returns versus the Stalking Horse Bid. [07/17/2026 Hearing Tr., pp. 101−103]. The Debtor's gross revenue remains consistent in 2026, but the Debtor's costs are not static. [07/17/2026 Hearing Tr., p. 101].

Third, with respect to the good faith finding, Dr. Saxena is correct that Link, as an insider, has a heightened responsibility to demonstrate that the sale is proposed in good faith and for fair value. *In re Bidermann Indus. U.S.A. Inc*., 203 B.R. 547 (Bankr. S.D.N.Y. 1997).  But "[i]t is not 'per se bad faith' for an insider to purchase assets of a debtor, and 'a sale to him without more would not suffice to show a lack of good faith.'"  *In re Bakalis*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) (quoting *In re Andy Frain Servs., Inc.* 798 F.2d 1113, 1125 (7th Cir. 1986)). Dr. Nitin Mariwalla testified at length that he did not discuss the sale directly with the Debtor or its principals (his father and sister) and negotiated the terms with the CRO on his own and through counsel. Dr. Nitin Mariwalla's testimony was credible and forthcoming with respect to each question.

Dr. Nitin Mariwalla's testimony did raise some concern for the Court with respect to what seems to be a lack of due diligence — electing not to review raw data for the accounts receivable, not determining in advance which physicians will remain employed, not determining in advance which locations may close or stay open or reviewing the leases — and he also demonstrated a lack of clarity with respect to certain terms of the Stalking Horse APA. But the Court also understands from his testimony that Dr. Nitin Mariwalla is a neurosurgeon who owns other medical practices, and he owns a medical billing practice.  Accordingly, it is possible that Dr. Nitin Mariwalla does not need to study the Debtor's records to have a general understanding of its historical profitability (or lack thereof), and/or future potential.

The Second Circuit has held that a purchaser's "intended use of the assets purchased is not relevant to the good faith inquiry . . . ." *In re Gucci*, 126 F.3d 380, 394 (2d Cir. 1997) (finding purchaser a good faith purchaser under Bankruptcy Code § 363(m)). The Court can think of numerous reasons Dr. Nitin Mariwalla may have for entering into this transaction, none of which are necessarily nefarious or indicate a lack of good faith: the size of this transaction may not be

13

significant for Dr. Nitin Mariwalla relative to his other businesses; he may have a sense of what the purchase price should be based on his years of experience in the healthcare and medical billing industries; and he may have additional thoughts of how the Debtor's assets will increase value for his other businesses. Most importantly, there is no evidence of fraud or collusion between the Debtor and Link despite the close relationship between their owners. The Court is satisfied that even under the heightened standard, the sale was proposed in good faith.

2.  **The *Lionel* Factors**

Next, the *Lionel* factors will be examined. Some of the factors set forth in *Lionel* are not relevant where, as exists here, the Debtor is selling substantially all of its assets. These factors include: (1) the proportionate value of the asset to the estate as a whole; (2) the effect of the sale on future plans of reorganization; (3) which of the alternatives of use, sale or lease, the proposal envisions; and (4) the likelihood that a plan of reorganization will be proposed and confirmed in the near future. *In re Oneida Lake Development, Inc*., 114 B.R. 352, 354 (Bankr. N.D.N.Y. 1990). The *Lionel* factors remaining are: (1) the amount of time that has lapsed since the petition was filed; (2) the proceeds to be generated from the sale versus the appraisals of the property; and (3) whether the assets being sold are increasing or decreasing in value.  *Id*. at 356.

With respect to the timing of the sale, this case was filed in January 2026, and approximately seven (7) months have elapsed. The Debtor has acted with deliberate speed but has not rushed the sale process. Dr. Saxena and the other creditors in this case had sufficient time to conduct an investigation of the Debtor and its assets, including an opportunity for Dr. Saxena to examine the Debtor under Bankruptcy Rule 2004, obtain his own appraisal of the Assets and put together his own bid for the Assets.[2] In fact, on May 11, 2026, this Court entered an order

---

[2] Dr. Saxena's counsel indicated at the Sale Hearing that Dr. Saxena is late in his career and is not interested in purchasing the Assets, but that only supports approval of the Stalking Horse APA.

14

authorizing under Bankruptcy Rule 2004 Dr. Saxena's examination of Dr. Rajkumar Mariwalla, Dr. Kavita Mariwalla, Dr. Nitin Mariwalla, and the CRO, and directing the production of documents. [ECF No. 110]. The Court understands that Saxena never actually sought discovery from these parties. [07/17/2026 Hearing Tr., p. 28].

The Assets were marketed as directed under the Bid Procedures Order, and while the Debtor did not obtain any appraisals for the practice as a going concern or its liquidation value, nor the few hard assets being sold, it appears that the marketing process conducted by the CRO was sufficient to establish a market value under the circumstances. [07/16/2026 Hearing Tr., p. 50]. The evidence demonstrates that the market for the Assets is limited, and the Debtor and CRO determined that solicitation of offers with a stalking horse was the best way to maximize a return. [Ryniker Declaration, p. 3]. Interested parties were given access to a virtual data room which included gross billings, bank collections and other reports to make an informed decision. [7/17/26 Hearing Tr., p. 151]. Although the equipment is unencumbered, it is not new, indicating it may not be of significant value given the likely high costs involved with moving medical equipment. Moreover, the CRO testified that the $250,000.00 cash portion of the Purchase Price is intended to cover, among other things, the unencumbered equipment. No evidence was offered by Dr. Saxena or anyone else at the Sale Hearing contradicting the CRO's conclusions with respect to value.

Finally, with respect to whether the Assets are increasing or decreasing in value as time passes, the evidence shows that the Assets are decreasing in value during this chapter 11 case. The Debtor's practice has not generated sufficient cash flow to last very long in bankruptcy. The CRO testified that in 2025, the Debtor operated at a loss and that Dr. Rajkumar Mariwalla did not draw his full salary. [07/16/2026 Hearing Tr., p. 152]. The losses for 2025 did not figure in interest, tax,

depreciation, and amortization, which would make the losses even steeper. [*Id*.]. The Debtor's financial distress extends to date as well. [*Id*.]. According to the CRO, the Debtor still struggles to pay its employees' salaries timely and in full. [*Id*., pp. 42−43].

Based on the testimony and exhibits, and for the reasons set forth above, the Court concludes that the Debtor has met its burden under the Bankruptcy Code and under the *Lionel* factors that a proper business justification exists to approve the sale of the Assets at this time.

### 3. Sale Guidelines

In addition to the requirements imposed by the Bankruptcy Code and applicable case law, the Court must also look to the Guidelines. Under the Guidelines, the sale proponent must, *inter alia,* state criteria for qualifying bids, disclose the measures taken to ensure a fair sale process if the motion proposes a sale to an insider, and satisfy certain noticing requirements. In addition, the evidence presented at a sale hearing must enable the Court to make certain findings as to, *inter alia*, the purpose of the sale, the sufficiency of the marketing process, whether the purchaser is acting in good faith within the meaning of Bankruptcy Code § 363(m), and that the sale transaction was entered into without collusion, in good faith, that it is arm's length, and that neither party would cause the agreement to be avoided under Bankruptcy Code § 363(n). The Guidelines also require any sale motion to identify and justify any "extraordinary provisions."

The Saxena Objection does not allege that the Debtor failed to satisfy any part of the Guidelines, and for the reasons set forth herein, the Court finds that the Motion and the sale process implemented here comply with all of these requirements

### 4. Objections to the Sale

Having found that the Debtor has met its burden of proof, the Court will now turn to the specific issues raised in the Saxena Objection.

### a. *Sub Rosa* **Plan**

The Saxena Objection asserts that the sale of the Assets to Link now, outside of a plan, is an impermissible "*sub rosa*" plan. In this Circuit, the Court must be wary of approving a sale outside of the plan process. For this reason, "the debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan '*sub rosa*' in connection with a sale of assets." *In re General Motors Corp.*, 407 B.R. at 495 (citing *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007)); *see also In re Chrysler LLC*, 405 B.R. 84, 97 (Bankr. S.D.N.Y. 2009).

Here, the Court concludes that the proposed sale of the Assets by the Debtor to Link is not a "*sub rosa*" plan of reorganization. The Assets are simply being sold; the lien holders will receive the sale proceeds in accordance with their lien priority; and remaining consideration will be subsequently distributed under a plan. As this Court has opined above, the proposed sale has a proper business justification — in large part based on the Debtor's inability to fund operations for much longer absent a sale or cash infusion — and is not calculated to evade the plan confirmation process. *In re Bos. Generating, LLC*, 440 B.R. at 331. The Court held a three (3) day evidentiary hearing on the proposed sale and the creditors in this case have been given ample opportunity to object to the sale process and to examine the parties to the sale. It is notable that the only creditor objecting is a former owner engaged in protracted litigation with the Debtor and Dr. Rajkumar Mariwalla, who declined to examine the relevant parties outside of the Hearing, make a competing offer, or offer any evidence contradicting the CRO's conclusions. Furthermore, the Debtor has demonstrated an inability to survive from a cash management perspective absent an immediate sale or cash infusion — waiting for a plan process would jeopardize the only sale transaction

available. Indeed, one doctor has already resigned from the Debtor's practice, and the fear is that if more doctors follow suit, the entire sale may be in jeopardy.

### b. Sale Free and Clear Pursuant to Bankruptcy Code § 363(f)

Bankruptcy Code § 363(f) permits a debtor to sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

> (1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

The Saxena Objection alleges that none of these factors are satisfied, but Link, a secured creditor, consents to the sale of the Assets free and clear of any interest in such property, and Dr. Rajkumar Mariwalla, the other secured creditor, is an owner of the Debtor which filed the Motion and asked this Court to approve the sale of the Assets free and clear of any interest in such property. Dr. Saxena argues that absent a declaration in support from Dr. Rajkumar Mariwalla in his capacity as a secured creditor, the Debtor lacks all of the consents necessary under Bankruptcy Code § 363(f)(2). The Court is not persuaded by this argument. Dr. Rajkumar Mariwalla is a secured creditor of the Debtor pursuant to a March 2025 secured loan, but he is also an equity holder who did not object to the proposed transaction, and his lien rights are subordinate to Link. Therefore, the sale meets the requirements of Bankruptcy Code § 363(f)(2).

### c.  Successor Liability Claims

The Saxena Objection asserts that the Court must not authorize the sale of the Assets to Link free of successor liability claims. Under Bankruptcy Code § 363(f), the Court has the authority to authorize the sale of the Assets free of any successor liability claims. *In Matter of Motors Liquidation Co.*, 829 F.3d 135, 156 (2d Cir. 2016); *In re Medical Software Solutions*, 286 B.R. 431, 446 (Bankr. D. Utah. 2002). The Debtor represents that its ability to transfer the Assets free from successor liability claims is critical to the proposed sale. To dispose of the Assets and induce Link to proceed with the proposed sale, the Debtor must convey the Assets free of potential successor liability claims. Absent such assurance, Dr. Nitin Mariwalla testified that Link would not have been willing to enter into the Stalking Horse APA or close on the proposed sale. [07/14/2026 Hearing Tr., p. 79]. The Motion includes a successor liability analysis, including why the granting of such relief is necessary and appropriate under the circumstances.

The cases cited by Dr. Saxena in the Saxena Objection arguing that this Court should not approve the sale of the Assets free of any successor liability claims are not controlling and are inapposite. First, in *In re Gulf Coast Oil Corp.*, 404 BR 407, 424 (Bankr. S.D. Tex. 2009), the bankruptcy court, in *dicta,* stated that according to the Fifth Circuit, "[i]f entities that control the debtor will benefit, or will potentially benefit, from the sale the court must carefully consider whether it is also appropriate to defer to their business judgment," it did not call for an outright automatic denial of said sale or for the imposition of successor liability on a purchaser. *Id.* Furthermore, here the CRO's judgment is relied upon with respect to the sale terms, and he does not own the Debtor nor does he benefit from the sale directly.

The Saxena Objection also relies upon *In re Cloverleaf Enters., Inc.*, No. 09-20056, 2010 Bankr LEXIS 1301, at *10 (Bankr. D. Md. Apr. 2, 2010), which concerned the denial of a sale

19

motion where the debtor negotiated a proposed agreement that precluded the marketing of the assets in question to anyone outside of the potential purchaser. Here, the Debtor sought and obtained the Court's approval of bid procedures and ran a robust marketing process in accordance with those approved procedures. Dr. Saxena had an opportunity to object to the proposed procedures, did so, and the sale timeline (in particular the marketing period) was adjusted as a result. There is no allegation that the Debtor did not comply with the Bid Procedures Order or that the Debtor took any action that chilled bidding. Further, there is no evidence that the Debtor, the CRO, or any of the retained professionals acted other than in good faith with an eye towards maximizing value for the benefit of the estate and its creditors.

Finally, this case is not like the facts of *In re Flour City Bagels, LLC*, 557 B.R. 53, 82 (Bankr. W.D.N.Y. 2016), where the bankruptcy court declined to approve the sale at issue. In *Flour City Bagels,* the insider was both the buyer and the entity in control of the debtor seller. 557 B.R. at 78. Here, the CRO negotiated the Stalking Horse APA on behalf of the Debtor while Dr. Nitin Mariwalla negotiated on behalf of Link, often relying on his counsel. The owners of the Debtor did not participate in the negotiations with Link or the sale process generally, other than when asked to do so specifically with respect to potential third-party purchasers.

Last, Dr. Saxena relies on Dr. Nitin Mariwalla's testimony regarding negotiations and due diligence seemingly to demonstrate that this was not a good faith, arms' length negotiation warranting approval free of successor liability claims. But Dr. Nitin Mariwalla's testimony weighs against any likelihood of future successor liability issues — *i.e.*, canceling contracts, not being sure an office will be maintained, and evaluating whether physicians will remain employed. Indeed, after considering Dr. Nitin Mariwalla's testimony, the Motion, the Reply, and the Ryniker Declaration, it appears to the Court that the Stalking Horse APA hardly checks the requirements

20

for a finding of successor liability. For these reasons, Dr. Saxena's objection to inclusion of language limiting Link's exposure to successor liability claims is overruled.

### d. Waiver of the Stay Periods

The Saxena Objection asserts that the Debtor has not met its burden to obtain a waiver of the fourteen (14) day stay under Bankruptcy Rules 6004(h) or 6006(d). Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R BANKR. P. 6004(h). Bankruptcy Rule 6006(d) provides that "[u]nless the court orders otherwise, an order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed for 14 days after the order is entered." FED. R BANKR. P. 6006(d).

The purpose of this rule is to "provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. A short period of time is often needed and essential to an objecting party intending to appeal because, if the sale is closed in the absence of a stay, any appeal by an objecting party may well be moot." 10 Collier on Bankruptcy ¶ 6004.11. In the event of an objection to this request, the proponent seeking to reduce the period must make a showing of "a sufficient business need to close the transaction within the 14-day period and the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected." *In re Borders Group, Inc*., 453 B.R. 477, 486 (Bankr. S.D.N.Y. 2011) (citing 10 COLLIER ON BANKRUPTCY ¶ 6004.11 (16th ed.) (internal quotations omitted); *see also In re Giftcraft Ltd.*, 672 B.R. 173, 186 (Bankr. S.D.N.Y. 2025) (holding movant "made a sufficient showing to waive Rules 6004(h) and 6006(d)" where movant "demonstrated good cause and a sound business purpose for the immediate consummation of the [sale] as contemplated by the APA").

21

Dr. Saxena argues that the Court should deny the Debtor's request for a waiver of the stay periods under Bankruptcy Rules 6004(h) and 6006(d) and has intimated that it will appeal an order approving the sale. However, the Debtor has provided a sufficient basis to grant its request for this waiver, especially given the Debtor's cash flow issues and the status letter filed by the Debtor immediately following the Sale Hearing advising that one of the Debtor's physicians has decided to leave the practice. The departing physician knew that a sale was likely imminent for the Debtor but was seemingly unable or unwilling to wait any longer. Debtor's counsel expressed concern at the Sale Hearing that any further delay could jeopardize the sale of the Assets to Link, including with respect to employee physicians and the Debtor's patients, as well asthe Debtor's ability to meet cash flow needs. Dr. Saxena's opposition to waiving the fourteen (14) day stay period focuses on future expected litigation (which can go forward in any event), but Dr. Saxena did not offer any expert testimony at the Sale Hearing to contest the various issues he and his counsel raised with the proposed sale transaction. The Court finds that the need to close quickly is a sufficient basis to overrule Dr. Saxena's opposition to this request.

### e. Section 363(m) Finding

The Saxena Objection demanded the right to examine Link at the Sale Hearing, and that the Court make a finding of Link's good faith before approving the sale under Bankruptcy Code § 363(m). Bankruptcy Code § 363(m) states that: "The reversal or modification of an appeal or an authorization under subsection (b) ... of this section of a sale ... of property does not affect the validity of a sale ... under such authorization to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale...were stayed pending appeal." 11 U.S.C. § 363(m). This provision "'codifies Congress's strong preference for finality and efficiency in the bankruptcy context, particularly where third

parties are involved.'" *In re WestPoint Stevens, Inc.*, 600 F.3d 231, 248 (2d Cir. 2010) (quoting *In re Rare Earth Minerals*, 445 F.3d 359, 363 (4th Cir. 2006)). The Second Circuit has held that the "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings …. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or any attempt to take grossly unfair advantage of other bidders.'" *Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997).

Based upon a careful review and thoughtful consideration of the testimony of Dr. Nitin Mariwalla at the Sale Hearing, and the pleadings submitted by the Debtor, the CRO, and Link in support of the sale, the Court finds that Link is entitled to the status of a good faith purchaser under Bankruptcy Code § 363(m).  Dr. Saxena was given ample opportunity to cross-examine Dr. Nitin Mariwalla during the three (3) day evidentiary Sale Hearing and has not demonstrated that Link and/or Dr. Nitin Mariwalla negotiated the terms of the sale transaction under the APA through fraud or collusion — quite the opposite. The Debtor, through the CRO, and Link, through Dr. Nitin Mariwalla's testimony, demonstrated that the parties went to great lengths to avoid even the appearance of impropriety. Nor did Dr. Nitin Mariwalla's or the CRO's testimony indicate to this Court that any attempt was made to "take grossly unfair advantage of other bidders" — there were none.  Dr. Nitin Mariwalla's testimony was credible and non-evasive. There is nothing in the record to contradict this finding.  There was no evidence that Dr. Nitin Mariwalla by and through Link is acting in bad faith, with lack of good faith, or with fraudulent intent.

A familial relationship, alone, is not a basis to deny this request. To the extent that Dr. Saxena relies on Dr. Nitin Mariwalla's alleged lack of due diligence in connection with negotiating the terms of the Stalking Horse APA by Link, this is not a winning argument. There are countless reasons a purchaser might offer to buy the assets of a medical practice, especially where that

purchaser and its owner also own, directly or indirectly, related medical practices. Furthermore, the Debtor facilitated this process through the CRO, not Dr. Rajkumar Mariwalla, a meaningful difference. Although Dr. Rajkumar Mariwalla was involved in talking to some potential bidders, he did not negotiate the terms of the Stalking Horse APA, nor was any evidence offered that he attempted to chill the bidding with any third parties. Without evidence of fraud, collusion or an attempt to take advantage of other bidders, Link is entitled to a Bankruptcy Code § 363(m) finding.

### f. Stark Law

Dr. Saxena claims that the sale of the Assets to Link may run afoul of applicable state and/or federal healthcare law or that certain provider agreements might contain anti-assignment provisions, thereby inhibiting Link's post-closing collection of receivables. One of those laws is the federal Physician Self-Referral Law, *a/k/a* the Stark Law, set forth under section 1877 of the Social Security Act (42 U.S.C. § 1395mm). The Stark Law prohibits a physician from referring a Medicare patient for certain "designated health services" ("DHS") to any health care facility or entity in with which the referring physician, or an immediate family member of the physician, has a direct or indirect financial relationship, unless the financial relationship satisfies one or more codified exceptions. The Stark Law also prohibits the entity furnishing the DHS from submitting claims to Medicare, the beneficiary or any other entity for Medicare DHS that are furnished as a result of a prohibited referral. The Stark Law typically does not apply to physician arrangements with ambulatory surgery centers. The Debtor and Link represent that they are not DHS entities nor are there actual referrals of DHS from physicians on one side to the other. In addition, any issues arising from the Stark Law would be solely an issue for Link, not the Debtor or its estate. The Debtor does not make any representation in the Stalking Horse APA regarding the satisfaction of or compliance with applicable state and/or federal healthcare law (such as Stark Law) or the

24

propriety of potentially assigning certain provider agreements. In fact, the Stalking Horse APA specifically includes a disclaimer of representations and warranties whereby the Debtor specifically disclaims any representations or warranties of any kind including, with respect to environmental, health, or safety matters. [Stalking Horse APA, section 3.2].  Last, this Court has stated on the record that any sale order must include language that the Court is not approving or opining on any healthcare laws, or the transaction's compliance with those laws, including but not limited to the Stark Law. The Court agrees that these are buyer side post-closing risks, and it is not being asked to review or confirm the applicability of health care law as part of the Motion.

## IV.    CONCLUSION

For the reasons set forth above, the objections to the Motion are **OVERRULED**, and the sale of the Assets is **APPROVED**. The Court shall enter an order consistent with this Memorandum Decision.



Dated: Central Islip, New York

August 13, 2026

Sheryl P. Giugliano
United States Bankruptcy Judge